**Opinion filed November 29, 2012**



## In The

# Eleventh Court of Appeals

_____

## No. 11-11-00097-CV

_____

### ABILENE REGIONAL MEDICAL CENTER, DEBBIE MARSH, APRIL NICHOLS, AND TARENA SISK, Appellants

### V.

### ADANELICA ALLEN AND DAVID ALLEN, INDIVIDUALLY AND AS NEXT FRIENDS OF MADISON ALLEN, Appellees

**On Appeal from the 259th District Court**

**Jones County, Texas**

**Trial Court Cause No. 022317**

### O P I N I O N

This interlocutory appeal involves a health care liability claim brought by appellees, Adanelica and David Allen, individually and as next friends of Madison Allen, their two-year-old daughter, against appellants, Abilene Regional Medical Center and nurses Debbie Marsh, April Nichols, and Tarena Sisk. Appellants appeal the trial court's order denying their motion to dismiss. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West 2011). We affirm in part and reverse and remand in part.

*Background Facts*

Appellees' health care liability claim arises from the events occurring prior to the birth of Madison with respect to Adanelica's course of labor at Abilene Regional. Appellees allege in their pleadings that Marsh, Nichols, and Sisk were labor and delivery nurses at Abilene Regional who cared for Adanelica when she presented to the hospital for induction of labor on August 18, 2008. Appellees' brought suit against Marsh, Nichols, and Sisk, alleging that they were negligent in their care and treatment of Adanelica. Appellees contend that the nurses failed to recognize signs and symptoms indicating that Madison was in respiratory distress. They allege that Madison suffered permanent brain damage as a result because the attending physician, Dr. Stanley, was not timely advised of her diminishing condition so that he could implement appropriate intervention.[1] Appellees also sued Abilene Regional, asserting that it is vicariously liable for the alleged negligence of Marsh, Nichols, and Sisk. Appellees additionally asserted that Abilene Regional is directly liable to them "for not ensuring that it staffed the labor and delivery unit with nurses who [sic] sufficient experience for this highly specialized care."

Appellees attached the expert reports of Dr. Ezell Autrey, M.D.; Joan Dauphinee, R.N.; and Dr. Robert A. Zimmerman, M.D. to their original petition in order to comply with the expert report requirements of Section 74.351(a). Appellants filed an objection to all three of the initial reports, which the trial court subsequently overruled in a written order. Appellees later filed a "Life Care Plan" prepared by Dr. Joe G. Gonzales, M.D., which appellants also challenged.[2] Appellants subsequently filed a motion to dismiss the action based upon the sufficiency of the expert reports. This appeal arises from the trial court's denial of appellants' motion to dismiss.

*Standard of Review*

We review a trial court's decision to deny a motion to dismiss under Section 74.351(b) for an abuse of discretion. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Hendrick Med. Ctr. v. Conger*, 298 S.W.3d 784, 787 (Tex. App.—Eastland 2009, no pet.). To determine whether a trial court abused its discretion, we must decide whether the trial court acted in an unreasonable or arbitrary manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

---

[1]Appellees did not file suit against Dr. Stanley.

[2]In light of appellees' assertion that they are not relying on Dr. Gonzales's life care plan to satisfy the expert report requirements, we do not address it in depth in this opinion.

2

A trial court must "grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report." Section 74.351(*l*). The statutory definition requires that the expert report provide a fair summary of the expert's opinion regarding the applicable standard of care, the manner in which the care rendered failed to meet that standard, and the causal relationship between the failure to meet the standard of care and the injury suffered. *Id.* § 74.351(r)(6). A report must be served as to each physician or health care provider against whom a liability claim is asserted. *Id.* § 74.351(a). However, a plaintiff may serve multiple reports by separate experts regarding different defendants, different claims, and different issues, as long as the reports, read together, provide a fair summary of the standard of care, breach, and causation. *Id.* § 74.351(i), (r)(6); *see also Packard v. Guerra*, 252 S.W.3d 511, 526 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) ("[S]ection 74.351(i) does not require that a single expert address all liability and causation issues with respect to a defendant."); *Martin v. Abilene Reg'l Med. Ctr.*, No. 11-04-00303-CV, 2006 WL 241509, at *4 (Tex. App.— Eastland Feb. 2, 2006, no pet.) (mem. op.) ("Section 74.351(i) expressly provides that a claimant may satisfy any requirement of the Act by providing reports of separate experts.").

A "good faith effort" under Section 74.351(*l*) "simply means a report that does not contain a material deficiency." *Samlowski v. Wooten*, 332 S.W.3d 404, 409–10 (Tex. 2011). If the report fulfills its two purposes, it represents a good faith effort. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001) ("In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort."). The two purposes of the expert report are to inform the defendant of the specific conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. *Leland v. Brandal*, 257 S.W.3d 204, 206–07 (Tex. 2008) (citing *Palacios*, 46 S.W.3d at 879). "In contrast, a report that omits an element or states the expert's opinions in conclusory form is not a good faith effort." *Samlowski*, 332 S.W.3d at 410 (citing *Palacios*, 46 S.W.3d at 879).

*Issues*

Appellants present three issues on appeal. In their first issue, they argue that the trial court abused its discretion when it determined that appellees filed sufficient expert reports based upon appellants' assertion that the reports did not satisfy the causal relationship requirement.

3

*See* Section 74.351(r)(6). Appellants assert in their second issue that the expert reports failed to address appellees' direct liability claims against Abilene Regional. In their third issue, appellants contend that the expert reports are deficient because they failed to distinguish the alleged acts and omissions of each appellant separately.

*Expert Reports*

A. Dr. Autrey's Report

Appellees primarily rely upon the report of Dr. Autrey to satisfy the expert report requirement. Dr. Autrey stated in his report that he is a board-certified obstetrician/gynecologist that has been practicing in the field for the past twenty-six years. He stated that he has managed patients that have been given Cytotec for cervical ripening followed by Pitocin for induction of labor. He further stated that he has attended "hundreds of deliveries" and that he is "familiar with the biological mechanism by which a fetus suffers brain injury when deprived of oxygen." Dr. Autrey also stated that he is aware of what a labor and delivery nurse should do when she has a patient with Cytotec for cervical ripening, Pitocin induction, and fetal distress.

Dr. Autrey initially detailed the treatment provided to Adanelica in the labor and delivery unit of Abilene Regional. She arrived at 10:10 p.m. on August 18, 2008, for the induction of labor. Dr. Stanley placed her initial administration of Cytotec at 10:48 p.m. Dr. Autrey stated that Sisk performed all subsequent Cytotec administrations. Dr. Autrey noted that Dr. Stanley ruptured Adanelica's membranes at 8:28 a.m. the next morning. Marsh started IV Pitocin at 8:40 a.m. and assumed care of Adanelica after Sisk. Marsh subsequently increased the administration of Pitocin. Dr. Autrey noted that Nichols decreased the administration of Pitocin at 12:23 p.m. due to signs of fetal distress. Marsh subsequently increased the administration of Pitocin until 2:38 p.m. when it was discontinued due to "'loss of capture' and variable decelerations." Marsh restarted Pitocin at 3:23 p.m.

Adanelica progressed to complete dilation at 4:20 p.m., after which time Marsh increased the administration of Pitocin. At 5:13 p.m., Dr. Stanley discussed a Caesarean section with Adanelica due to fetal distress. Madison was delivered at 5:27 p.m. with a "nuchal cord times one."[3] Dr. Autrey detailed that Madison took her first spontaneous breath at around seven minutes and that she had seizures and apneic periods soon after arrival.

---

[3]Dauphinee noted in her expert report that a "nuchal cord" describes a situation when the umbilical cord is wrapped around the baby's neck.

Under a section of his report labeled "TARENA SISK, R.N., DEBBIE MARSH, R.N. AND APRIL NICHOLS, R.N.," Dr. Autrey opined that the applicable standard of care for labor and delivery nurses managing a patient receiving Cytotec for cervical ripening followed by IV Pitocin for induction of labor requires them to do as follows: (1) maintain a readable tracing of the fetal heart tones and contraction pattern; (2) not start, increase, or continue Pitocin on a patient with a non-reassuring fetal monitor tracing, no uterine contraction monitoring, or uterine hyperstimulation; (3) notify the physician if there is a non-reassuring fetal heart tones tracing; (4) discontinue Pitocin when there is a non-reassuring fetal heart tones tracing; and (5) initiate intrauterine resuscitation when a baby has non-reassuring fetal heart tones. Dr. Autrey further opined that the nurses breached each of the applicable standards of care that he listed.

Dr. Autrey then detailed instances when the various events he cited occurred. He noted that a readable tracing of uterine contractions was not present from 10:51 p.m. until 2:39 a.m. He opined that a reasonable labor and delivery nurse should be on heightened vigilance to ensure the fetus is receiving adequate oxygen if a fetal monitor is not properly working. He identified 9:45 a.m. to 10:03 a.m. as another period when the fetal heart rate was not being properly traced. Dr. Autrey also noted that Marsh increased Pitocin at 11:04 a.m. and 11:49 a.m. even though there were non-reassuring fetal heart tones. Dr. Autrey stated that, "[a]t no time was Dr. Stanley notified of these non-reassuring fetal heart tones or of the poor non-readable fetal heart tones and contraction pattern." He further stated that the nurses' deviations from the applicable standard of care "were the direct and proximate cause" of the injuries to Madison, including metabolic acidosis, seizure, severe hypoxic ischemia, and permanent brain damage.

Dr. Autrey's report then contained a section labeled "ABILENE REGIONAL MEDICAL CENTER." He opined that the standard of care for a reasonable prudent hospital is to ensure that its labor and delivery nurses abide by the applicable standards of care when managing a patient receiving Cytotec for cervical ripening and then IV Pitocin for induction. He then essentially repeated the standards of care that he had previously identified for the nurses and their alleged breaches of the applicable standards of care.

Near the end of his report, Dr. Autrey stated as follows:

Had the nurses apprised Dr. Stanley of the non-reassuring tracings earlier, this would have alerted a reasonable and prudent OB/GYN to institute a Caesarean section earlier than he did. The multiple decelerations that baby Madison experienced, combined with the lack of proper uterine contraction tracing the night before, would have convinced a reasonable and prudent

5

OB/GYN to perform a Caesarean section before oxygen deprivation reached a brain-damaging level.

Oxygen is necessary for our cells to survive and function. Without oxygen, cells die. Continued oxygen deprivation causes brain damage in fetuses as well as adults.

Upon review of the fetal monitoring strips, the hypoxic ischemic encephalopathy (brain damage to due to oxygen deprivation) this child suffered was a culmination of multiple decelerations but the vast majority of the damage began at or around [5:01 p.m.] through [5:27 p.m.] on 8/19/08. This is based on the drop of the baby's heart rate to around 60-70 beats per minute at or around [5:01 p.m.]. This is caused by umbilical cord compression denying oxygen to the fetus, much as a situation in which a hardhat diver submerged in a body of water had a prankster clamp his hand on the hose feeding him air. Without oxygen brain cells die, in a fetus or in a person outside the womb. My opinion, based on a reasonable degree of medical probability, is that the permanent brain damage to this child began at or around [5:01 p.m.]. Obviously, had the child been taken from the womb by Caesarean section before [5:01 p.m.] this injury would not have occurred.

The decelerations that had been occurring, had the doctor been informed of them, would have alerted the physician that umbilical cord was obstructed in such a position that it was not letting this oxygenated blood get to the fetus well. This obstruction is likened to a kink in a hose. When the cord shifted such that the obstruction got a little worse, the crash occurred at [5:01 p.m.]. Had Dr. Stanley been armed with the knowledge of the prior decelerations by the nurses, the standard of care dictates he would have performed a Caesarean section several hours before the [5:01 p.m.] crash occurred.

B. Dauphinee's Report

Dauphinee began her report by stating that she is a registered nurse in Florida and that she has been a nurse for forty years. She stated that she has worked in labor and delivery units, published journal articles and textbooks in this area of nursing, and lectured nationally on obstetrical topics. Dauphinee further stated that she is familiar with the standards of care for obstetrical nurses.

Dauphinee noted that Adanelica was admitted to the labor and delivery unit by Sisk for the induction of labor. Dauphinee also described the roles of Cytotec and Pitocin in inducing labor. She stated that Pitocin is usually controlled by the nurse. Pitocin is increased to increase contractions and decreased or stopped if the contractions get too strong, long, or close together, which might decrease oxygen to the baby. Dauphinee stated that the manner in which Pitocin is

6

adjusted is based on whether or not "the tracing is reassuring or non-reassuring." She further stated that Pitocin should only be continued or increased if the tracing is reassuring and that it should be discontinued with non-reassuring fetal monitoring tracing.

Dauphinee's report continues with a review of the medical records. She noted that, "[d]uring the night while under the care of Sisk the fetal monitor was not tracing contractions well." Dauphinee noted that the tocotransducer that identifies the beginning and the end of contractions was not working from 10:51 p.m. to 1:43 a.m. She stated that it is very important for this instrument to be working to record contractions during the administration of a labor induction agent so that the nurse can be certain that there is not too much uterine activity. Dauphinee indicated that non-reassuring tracings occurred between 1:44 a.m. and 2:19 a.m., from 2:39 a.m. to 4:29 a.m., from 5:20 a.m. to 6:18 a.m., and from 6:27 a.m. to 8:11 a.m.

Dauphinee noted that Marsh took over care of Adanelica at 8:40 a.m. until delivery. Marsh started Pitocin at that time. Dauphinee indicated that Marsh increased the dosage of Pitocin at 9:17 a.m. even though there were "late decelerations with decreased variability." Dauphinee noted that Pitocin was later increased at 11:04 a.m. and 11:49 a.m. "even though the tracing was non-reassuring." She then noted that the dosage of Pitocin was decreased at 12:23 p.m. by Nichols as a result of the fetal monitor tracing. Dauphinee further noted that this was the only entry in the medical records made by Nichols. Pitocin was discontinued at 2:38 p.m. due to "'loss of capture' and variable decelerations." Pitocin was restarted at 2:46 p.m., increased at 4:01 p.m., and never stopped, "even with an ominous tracing."

Dauphinee concluded her report by listing the following alleged breaches of the applicable standard of care for labor and delivery nurses:

Not maintaining a readable tracing (Nurse Sisk and Nurse Marsh)
Not maintaining a readable tracing with a non-reassuring fetal monitoring tracing (Nurse Sisk and Nurse Marsh)
Not maintaining a readable contraction pattern, especially with administration of pitocin and/or cytotec (Nurse Sisk and Nurse Marsh)
Not decreasing pitocin with a non-reassuring fetal monitoring tracing (Nurse Marsh)
Not discontinuing pitocin with a non-reassuring fetal monitoring tracing (Nurse Marsh and Nurse Nichols)
Increasing pitocin with a non-reassuring fetal monitoring tracing (Nurse Marsh)
Not notifying the physician of non-reassuring fetal monitoring tracings [(]Nurse Sisk and Nurse Marsh)

Not notifying the physician of inability to maintain a continuous tracing (Nurse Sisk, Nurse Nichols and Nurse Marsh)

Not placing this newborn on monitors after resuscitation at delivery.

### C. Dr. Zimmerman's Report

Dr. Zimmerman notes in his report that he is the chief of pediatric neuroradiology at The Children's Hospital of Philadelphia. Compared to Dr. Autrey's report and Dauphinee's report, Dr. Zimmerman's report is quite brief. He briefly commented on his findings from two ultrasound examinations and an MRI. He then summarized his findings as follows: "The MRI is the most important study, showing the characteristic findings of profound asphyxia, which are consistent with bradycardic events occurring in the pre-delivery period. These are not a manifestation of a strep infection, unless the strep infection were to cause an acute cardiovascular collapse in the infant."

*Causal Relationship*

Appellants present three sub-issues in support of their contention that the expert reports do not sufficiently address the causal relationship requirement. Specifically, appellants contend: (1) the reports of Dr. Zimmerman, Dr. Gonzales, and Dauphinee do not address the required element of causal relationship; (2) Dr. Autrey is unqualified to opine as to causal relationship in this case; and (3) Dr. Autrey's opinions regarding causal relationship are conclusory, hinge upon unsubstantiated assumptions, and conflict with the other expert reports.

We first examine the sub-issue concerning Dr. Autrey's qualifications to offer an opinion concerning causal relationship. Appellants contend that he is not qualified to offer an opinion on causal relationship because he is not a neurologist or a pediatric neuroradiologist. They further assert that "[n]either the report nor curriculum vitae of Dr. Autrey demonstrate his competence or qualifications to testify on the cause or timing of neurological injuries allegedly suffered by Madison Allen during labor and delivery." We disagree.

In *Livingston v. Montgomery*, 279 S.W.3d 868, 869 (Tex. App.—Dallas, 2009, no pet.), an obstetrician/gynecologist provided an expert report pertaining to neurological injuries that a baby allegedly suffered during labor and delivery. In addressing a challenge to the obstetrician/gynecologist's qualifications to offer an opinion on causation, the court of appeals focused on the question of whether he, as a non-neurologist, was qualified under the statute to provide an expert report on the cause of neurological injuries. 279 S.W.3d at 876. The court concluded that the obstetrician/gynecologist's expertise in managing labor and delivery qualified

him to opine on the causal relationship between labor and delivery and the complications that stem from labor and delivery, including a newborn's neurological injuries. *Id.* at 877. In reaching this holding, the court noted that the causation issue in the case related to the duty of health care providers to recognize potential harm and take appropriate actions. *Id.*

The alleged acts of negligence in *Livingston* are quite similar to those alleged in this appeal. Furthermore, this appeal also involves a causation issue pertaining to complications arising from labor and delivery. Appellants assert that *Livingston* is distinguishable because the obstetrician/gynecologist included the following statement in his expert report pertaining to his qualifications:

> Although I am not a neurologist, as an obstetrician I have knowledge and expertise to recognize the perinatal progression of hypoxia due to inadequate oxygenation through a compromised uteroplacental unit—either because of uteroplacental insufficiency or inadequate refractory periods between contractions or both; I have knowledge and expertise on the subject of hypoxia as it relates to the associated build up of carbon dioxide (hypercapnia) that complicates ischemia and which makes the unborn infant at risk for a rebound brain perfusion that results in perinatal neurological brain injury.

*Id.* at 874. We disagree. While Dr. Autrey did not include as detailed of a description of his qualifications on causation, he stated that he is "familiar with the biological mechanism by which a fetus suffers brain injury when deprived of oxygen." He supported this statement by noting that he had attended "hundreds of deliveries." As was the case in *Livingston*, the trial court did not abuse its discretion in determining that Dr. Autrey's report contained a sufficient statement of his qualifications to offer his opinion on the causal relationship between labor and delivery and the complications that stem from labor and delivery, including a newborn's neurological injuries.

Appellants also argue that Dr. Autrey's opinion on causation is insufficient. Among other things, they contend that his opinion is conclusory and speculative. Autrey opines that, had the nurses reported negative findings to Dr. Stanley earlier, he would have performed a Caesarean section sooner thereby avoiding the severe crash that began at 5:01 p.m. Appellants contend that Dr. Autrey's opinion to the effect that Dr. Stanley would have performed a Caesarean section earlier is pure speculation and thereby conclusory. We disagree. We addressed a similar situation in *Martin*. The claimant in *Martin* alleged that a hospital nurse was negligent in failing to inform the treating physician of his failure to prescribe a necessary

medication to a heart patient at discharge. 2006 WL 241509, at \*4–5. We held that the expert reports in *Martin* were sufficient because they identified what the treating physician should have done if he had been armed with the correct information. The reasoning in *Martin* is applicable to Dr. Autrey's report. His report constitutes a good faith effort to provide a fair summary of causation because he identifies what a reasonable and prudent obstetrician would have done if he had been provided the correct information.

Appellants additionally contend that Dr. Autrey's opinion on causation is insufficient because it refers to the nurses' conduct collectively rather than separately identifying their acts and omissions. Appellants also present this contention in their third issue when addressing the expert reports' allegations of the negligent acts of the nurses and Abilene Regional. We will address the contention in our consideration of appellants' third issue.

Appellants additionally contend that Dr. Autrey's opinion on causation is insufficient because it conflicts with matters contained in other expert reports and the facts in the case. The inquiry at the report stage focuses on whether the information within the four corners of the report meets the good faith requirement of the statute. *Palacios*, 46 S.W.3d at 878–79; *Schrapps v. Lam Pham*, No. 09-12-00080-CV, 2012 WL 4017768, at \*3 (Tex. App.—Beaumont Sept. 13, 2012, no pet. h.) (mem. op.). If the facts do not support a plaintiff's claim, summary judgment procedures provide a remedy. *See* Tex. R. Civ. P. 166a; *Shcrapps*, 2012 WL 4017768, at \*3.

Having found Dr. Autrey's opinion on causation sufficient, we need not address appellants' contentions pertaining to the other expert reports on the matter of causation. Appellants' first issue is overruled.

*Direct Liability vs. Vicarious Liability*

In their second issue, appellants contend that the expert reports do not adequately address appellees' direct liability claim against Abilene Regional. We begin our analysis by addressing appellees' counterargument. Citing *Certified EMS, Inc. v. Potts*, 355 S.W.3d 683 (Tex. App.—Houston [1st Dist.] 2011, pet. granted), appellees contend that their expert reports are not required to support every theory of liability asserted as long as at least one theory is adequately supported. We recently addressed this issue in *Hendrick Medical Center v. Miller*, No. 11-11-00141-CV, 2012 WL 314062 (Tex. App.—Eastland Jan. 26, 2012, no pet.) (mem. op.). In *Miller*, we expressly declined to follow the holding in *Potts*. *Id.* at \*3. For the reasons

expressed in *Miller*, we reaffirm our holding that direct liability and vicarious liability claims must be separately evaluated to determine whether each claim is supported by a sufficient expert report.

Appellees' petition included a direct liability claim against Abilene Regional that reads in its entirety as follows:

## DIRECT LIABILITY OF DEFENDANT
## ABILENE REGIONAL MEDICAL CENTER

> Additionally, Abilene Regional Medical Center is liable for not ensuring that it staffed the labor and delivery unit with nurses who [sic] sufficient experience for this highly specialized care. Abilene Regional placed Debbie Marsh on the labor and delivery unit even though she lacked the requisite skill and experience to care for Adanelica and Madison, which proximately resulted in the injuries to Adanelica and Madison. For this negligence, Abilene Regional Medical Center is liable.

Appellees' direct liability claim appears to include elements of negligent hiring, negligent training, and negligent supervision claims as they pertain to Marsh. Dr. Autrey references these claims to some extent by opining that Abilene Regional did not ensure that its labor and delivery nurses abided by the applicable standards of care when managing a patient receiving Cytotec for cervical ripening and then IV Pitocin for induction. However, the expert reports do not contain any reference to Marsh's educational background and do not provide any insight on Abilene Regional's staff training, policies, or procedures. *See TTHR Ltd. P'ship v. Moreno*, No. 02-10-00334-CV, 2011 WL 2651813, at *3 (Tex. App.—Fort Worth July 7, 2011, pet. granted) (mem. op.). Thus, the reports are deficient with regard to Abilene Regional's direct liability. Appellants' second issue is sustained in part.

Section 74.351(c) provides that, if a report is considered not to have been served because elements of the report are found deficient, the court may grant one thirty-day extension to the claimant in order to cure the deficiency. In light of the trial court's determination that the reports were not deficient, it has not considered whether appellees should be granted an extension to cure their reports' deficiencies regarding the direct liability claim against Abilene Regional or whether it should dismiss the claim. *See Moreno*, 2011 WL 2651813, at *5. Accordingly, we remand the case so that the trial court has the opportunity to determine whether appellees should be granted a thirty-day extension to cure what we have held to be deficient. *See Leland*, 257 S.W.3d at 207 (noting that every court of appeals that has addressed a deficient report has

11

remanded the case to the trial court for the trial court to determine whether to grant an extension); *Moreno*, 2011 WL 2651813, at *5.

## Specificity of Reports as to Each Nurse

Appellants assert in their third issue that the expert reports do not sufficiently specify the particular alleged acts of negligence with respect to each of the nurses. Dr. Autrey references each of the nurses by name in his report, primarily from a chronological perspective in their treatment of Adanelica during her labor and delivery. He devoted the bulk of his report to the actions of Marsh. As we noted in *Martin*, Section 74.351(i) expressly provides that a claimant may satisfy any requirement of Section 74.351 by providing reports of separate experts. 2006 WL 241509, at *4. Dauphinee went into greater detail in her report in addressing the care and treatment of Adanelica by the nurses. As quoted above, Dauphinee alleged approximately ten negligent acts or omissions that she attributed to one or more of the nurses by parenthetical reference. We conclude that, when read together, the reports of Dr. Autrey and Dauphinee constitute a good faith effort to differentiate the alleged negligent acts of the nurses. Appellants' third issue is overruled.

## This Court's Ruling

We affirm the trial court's order denying appellants' motion to dismiss with respect to appellees' claims against the nurses individually and their vicarious liability claims against Abilene Regional. We reverse the trial court's order denying appellants' motion to dismiss as to the direct liability claim against Abilene Regional, and we remand this case to the trial court for further proceedings consistent with this opinion, including a determination of whether appellees should be granted a thirty-day extension to cure what we have held to be deficient with regard to their direct liability claim against Abilene Regional.

TERRY McCALL

JUSTICE

November 29, 2012

Panel consists of: Wright, C.J.,
McCall, J., and Gray, C.J., 10th Court of Appeals.[4]

[4]Tom Gray, Chief Justice, Court of Appeals, 10th District of Texas at Waco, sitting by assignment to the 11th Court of Appeals.