

NUMBER 13-14-00376-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ANNIE DORSEY, INDIVIDUALLY AND                      Appellant,
A/N/F OF EZRA DORSEY,

**v.**

NIKHILKUMAR C. RAVAL, M.D.,                          Appellee.

**On appeal from the 136th District Court
of Jefferson County, Texas.**

# O P I N I O N

**Before Justices Rodriguez, Garza and Longoria
Opinion by Justice Garza**

Appellant, Annie Dorsey, individually and as next friend of her minor daughter Ezra

Dorsey, appeals the trial court's no-evidence summary judgment rendered in favor of

Nikhilkumar C. Raval, M.D.  By thirteen issues, Dorsey contends that the trial court erred

by (1) rendering summary judgment in favor of Raval, (2) severing her claims against

Raval from her claims against other defendants, and (3) awarding attorney's fees and costs to Raval. We affirm.[1]

## I. BACKGROUND

Raval is a physician and director of the neonatal intensive care unit ("NICU") at Christus-St. Mary Hospital ("Christus") in Port Arthur, Texas. On August 14, 2010, Dorsey gave birth to her daughter Ezra at Christus. Because the child was born premature, she was kept in the NICU. On September 13, 2010, a nurse employed at Christus, Leslie McDonald Lovelace, tripped on monitoring equipment wires and dropped Ezra onto the floor, causing the child to suffer a skull fracture. Dorsey contends that Ezra was left on the floor for approximately thirteen minutes before she was found by Raval.

On September 12, 2012, Dorsey sued Christus, Raval, and Lovelace, alleging that their negligence caused Ezra's injuries.[2] Specifically with respect to Raval, Dorsey's live petition alleged that he was directly liable as well as vicariously liable due to the negligence of Lovelace. Dorsey moved for partial summary judgment on December 3, 2013, contending that the defendants' liability was established as a matter of law. Raval moved for no-evidence summary judgment on December 9, 2013, contending that Dorsey had failed to provide any evidence that Raval breached the applicable standard of care or that any such breach caused Ezra's injuries. By letter ruling dated January 17, 2014, without a hearing, the trial court denied Dorsey's motion and granted Raval's motion with respect to Dorsey's claims of direct liability.[3] The trial court's order specifically noted that

---

[1] This appeal was transferred from the Ninth Court of Appeals pursuant to a docket equalization order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through Ch. 46, 2015 R.S.).

[2] Neither Christus nor Lovelace are parties to this appeal.

[3] On appeal, Dorsey does not contend that the trial court erred in denying her motion for partial

2

Dorsey's claims of vicarious liability against Raval remained pending. Raval then filed a second motion for no-evidence summary judgment, this one relating to Dorsey's vicarious liability claims. The trial court granted Raval's second motion by letter ruling dated March 7, 2014.

Raval subsequently moved to sever the claims against him, all of which had since been disposed of by summary judgment, from Dorsey's claims against the other defendants. Dorsey filed a motion for new trial alleging that Raval's summary judgment motions had been improperly granted. After a hearing on April 21, 2014, the trial court granted Raval's motion to sever, denied Dorsey's motion for new trial, and rendered a take-nothing final judgment in favor of Raval. The final judgment also assessed all costs against Dorsey. This appeal followed.

## II. DISCUSSION

### A. Severance

We first address Dorsey's seventh through twelfth issues, in which she challenges the trial court's granting of Raval's motion to sever. By these issues, Dorsey argues that the trial court erred in severing Raval's claims because: (1) Dorsey's suit does not involve more than one distinct cause of action; (2) the claims against Raval are not the proper subject of a separate lawsuit that could have been independently asserted; (3) the claims against Raval are "so interwoven" with the remaining claims that they involve the same facts and issues; (4) the remaining defendants are alleged to have the same liability as Raval; (5) the injury suffered is indivisible; and (6) severance did not "do justice or avoid prejudice" or avoid inconvenience.

---

summary judgment.

Texas Rule of Civil Procedure 41 provides that "[a]ny claim against a party may be severed and proceeded with separately." TEX. R. CIV. P. 41.

> A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues.

*F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 693 (Tex. 2007) (citing *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990)). "[A]voiding prejudice, doing justice, and increasing convenience are the controlling reasons to allow a severance." *Id.* A trial court's order severing a claim will not be reversed unless the trial court abused its discretion. *Id.*

Dorsey's claims against Raval—in particular, her vicarious liability claim—arguably involve some of the same facts and issues as her claims against the other defendants. However, at the time severance was granted in this case, all of Dorsey's claims against Raval had been dismissed by summary judgment. On the other hand, Dorsey's claims against the other defendants were not dismissed and remained pending. In *Garcia v. Willman*, we observed that "[t]he Supreme Court has recognized that severance after summary judgment in an effort to expedite appellate review is not an abuse of discretion." 4 S.W.3d 307, 311–12 (Tex. App.—Corpus Christi 1999, no pet.) (citing *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 525–26 (Tex. 1982)). In *Garcia*, we held that it was not an abuse of discretion for the trial court to have severed claims against a doctor which were already disposed of by summary judgment, even though the claims against all defendants were based on the same alleged act of negligence. *See id.* at 309 (noting that, according to the plaintiff's expert report, all defendants "fell below the standard of care in treating Garcia because they failed to diagnose and treat Garcia's condition prior

4

to prescribing Dilantin and discharging her from the hospital"). Similarly, here, severance was not an abuse of discretion because the claims against Raval, unlike the claims against the other defendants, had already been disposed of by summary judgment. *See id.* at 312 (noting that, "[b]y granting the severance, the judgment became final and appealable, thereby allowing Garcia the benefit of this appeal"); *see also Cherokee Water Co.*, 641 S.W.2d at 526. We overrule Dorsey's seventh through twelfth issues.

## B. Summary Judgment

Dorsey raises six issues challenging the trial court's granting of Raval's no-evidence summary judgment motions.

### 1. Notice as to Hearing on First Motion

By her first issue, Dorsey contends that the trial court erred in granting Raval's first summary judgment motion because fewer than twenty-one days elapsed between the time the motion was filed—December 9, 2013—and the time the motion was granted—December 30, 2013. *See* TEX. R. CIV. P. 166a(c) ("Except on leave of court, with notice to opposing counsel, the motion and any supporting affidavits shall be filed and served at least twenty-one days before the time specified for hearing."); *see also* TEX. R. CIV. P. 4 ("In computing any period of time prescribed or allowed by these rules . . . the day of the act, event, or default after which the designated period of time begins to run is not to be included."); *Lewis v. Blake*, 876 S.W.2d 314, 316 (Tex. 1994) (holding that "the day of service is not to be included in computing the minimum 21–day notice for hearing," but "the day of hearing is"). Dorsey made this argument in her motion for new trial.

In response, Raval notes that, according to the trial court's January 14, 2014 letter ruling, "the parties agreed to the Court addressing both Plaintiff's Motion for Partial

Summary Judgment and Dr. Raval's No Evidence Motion for Summary Judgment through submission." However, Dorsey denied that she agreed to the submission of the motions on December 30, and the trial court's letter ruling does not state that Dorsey was provided notice that Raval's motion would be ruled upon within twenty-one days of filing, as the rule requires; it merely states that the parties agreed to forgo a hearing. *See* TEX. R. CIV. P. 166a(c).

Nevertheless, the record does reflect that the parties agreed to have the two initial opposing summary judgment motions heard by submission on December 30. In particular, during the motion for new trial hearing on April 21, 2014, Raval's counsel stated that "we all agreed that Plaintiff's motion and the Defense motion which was—we stated was about to be filed and which was subsequently filed would be submitted on December 30th. That's my recollection." Dorsey's counsel, who was present at the hearing, did not dispute this recollection. Moreover, there is nothing in the record indicating that Dorsey objected, at any time prior to the motion for new trial, to the submission of the motions on December 30. *See Nguyen v. Short, How, Frels & Heitz, P.C.*, 108 S.W.3d 558, 560 (Tex. App.—Dallas 2003, pet. denied) (noting that "[t]he nonmovant waives any objection to an untimely notice by failing to object. . . . To hold otherwise would allow a party who participated in the hearing to lie behind the log until after summary judgment is granted and then raise the complaint of late notice for the first time in a post-trial motion.") (citing *May v. Nacogdoches Mem'l Hosp.*, 61 S.W.3d 623, 627 (Tex. App.—Tyler 2001, no pet.); *Veal v. Veterans Life Ins. Co.*, 767 S.W.2d 892, 895 (Tex. App.—Texarkana 1989, no writ)). For the foregoing reasons, we overrule Dorsey's first issue.

## 2.	Formal Defects

Dorsey contends by three issues that the trial court erred in granting summary judgment because of formal defects in the motions.

By her second issue, Dorsey contends that summary judgment was granted on an affirmative defense and that this was improper because Raval raised no affirmative defenses in his responsive pleadings.  *See* TEX. R. CIV. P. 94; *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 494 (Tex. 1991) ("A party relying on an affirmative defense must specifically plead the defense and, when the defense is based on a claim enumerated in rule 93, must verify the pleading by affidavit.").  We disagree.  In his first summary judgment motion, Raval argued that Dorsey had "shown no facts" to support her claim that Raval "breached the standard of care" or "that there was a causal connection between the alleged breach and Plaintiffs' injuries."  In his second summary judgment motion, Raval argued that

> after a year and four months of discovery Plaintiffs have not provided any evidence to establish the following essential elements of a medical malpractice claim:  1) what the standard of care which applies to their vicarious liability claims against Dr. Raval is; 2) how Dr. Raval vicariously breached this standard of care; and, 3) how this alleged breach proximately caused the Plaintiffs' alleged damages.

It is apparent that Raval's motions were not based on affirmative defenses, but were rather based on the alleged lack of evidence to support the essential elements of Dorsey's negligence claim.  *See* TEX. R. CIV. P. 166a(i) (authorizing motion for no-evidence summary judgment).

By her third issue, Dorsey contends that Raval's motions "are a general challenge to the sufficiency of the Plaintiffs' case that fails to challenge any specific element of a claim or defense on which the Plaintiff would have the burden of proof at trial."  *See* TEX.

7

R. CIV. P. 166a(i) (stating that a no-evidence summary judgment motion "must state the elements as to which there is no evidence"). However, as explained above, Raval's first motion specifically alleged that there was no evidence to support the breach and causation elements of Dorsey's cause of action, and his second motion specifically alleged that there was no evidence to support the standard of care, breach, and causation elements. *See, e.g., Brandt v. Surber*, 194 S.W.3d 108, 115 (Tex. App.—Corpus Christi 2006, pet. denied) (setting forth essential elements of medical negligence claim).

By her sixth issue, Dorsey contends that Raval "circumvented special exceptions practice" by filing a no-evidence summary judgment motion instead of special exceptions to Dorsey's pleadings. She argues: "If the Plaintiffs' pleadings are insufficient to state a cause of action, Dr. Raval should have challenged the Plaintiffs' pleadings by special exceptions, not by a motion for no evidence summary judgment." However, as elucidated above, Raval's summary judgment motions did not contest the sufficiency or specificity of Dorsey's pleadings; it argued that there was no evidence to support those pleadings.

We overrule Dorsey's second, third, and sixth issues.

### 3. Waiver of Objections to Evidence

Dorsey contends by her fifth issue that, in granting summary judgment, the trial court impermissibly considered untimely objections made by Raval to certain evidence produced by Dorsey. The evidence at issue is an affidavit by Urmila Chaudhry, M.D., a neonatologist at a hospital in Montana and an attorney licensed to practice in Illinois, which was filed by Dorsey on May 29, 2013, in order to comply with the expert report requirement of section 74.351 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West, Westlaw through Ch. 46, 2015 R.S.). The

8

trial court found, in its January 14, 2014 letter ruling granting summary judgment to Raval on Dorsey's direct liability claim, that Chaudhry's report was conclusory as to the breach and causation elements. Dorsey argues that the trial court was not permitted to consider any objections to Chaudhry's report at the summary judgment stage because Raval did not object to the report within twenty-one days of it being filed as required by section 74.351. *See id.* ("Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived.").

This issue lacks merit. The Texas Supreme Court has explained that, for purposes of section 74.351, a report "can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Am. Transitional Care Centers of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001); *Patterson v. Ortiz*, 412 S.W.3d 833, 836 (Tex. App.—Dallas 2013, no pet.); *Abilene Reg'l Med. Ctr. v. Allen*, 387 S.W.3d 914, 923 (Tex. App.—Eastland 2012, pet. denied) ("The inquiry at the report stage focuses on whether the information within the four corners of the report meets the good faith requirement of the statute. . . . If the facts do not support a plaintiff's claim, summary judgment procedures provide a remedy."); *Pediatrix Med. Services Inc. v. De La O*, 368 S.W.3d 34, 41 (Tex. App.—El Paso 2012, no pet.); *Kingwood Pines Hosp., LLC v. Gomez*, 362 S.W.3d 740, 746 (Tex. App.—Houston [14th Dist.] 2011, no pet.). In other words, merely because an expert report is sufficient to pass muster under section 74.351 does not mean that it will be sufficient to withstand a summary judgment motion. When a party declines to file

objections to an expert report within twenty-one days of its filing, it may not thereafter contend that the report is insufficient to satisfy section 74.351; but there is nothing prohibiting the party from subsequently arguing that the report is insufficient to create a fact issue that would preclude summary judgment.

We overrule Dorsey's fifth issue.

### 4.      Fact Issue

Dorsey attacks the merits of the trial court's summary judgment ruling by her fourth issue. She argues that she produced evidence sufficient to raise a genuine issue of material fact as to each essential element of her claims against Raval.

### i.      Applicable Law and Standard of Review

We review summary judgments de novo. *Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013); *Nalle Plastics Family L.P. v. Porter, Rogers, Dahlman & Gordon, P.C.*, 406 S.W.3d 186, 199 (Tex. App.—Corpus Christi 2013, pet. denied). In doing so, we review the evidence "in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

A no-evidence summary judgment motion under Texas Rule of Civil Procedure 166a(i) is essentially a motion for a pretrial directed verdict; it requires the nonmoving party to present evidence raising a genuine issue of material fact supporting each element contested in the motion. TEX. R. CIV. P. 166a(i); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006). A fact issue exists if the non-movant produces more than a scintilla of probative evidence. *Neely*, 418 S.W.3d at 59. Evidence is more than a scintilla if it "rises to a level that would

enable reasonable and fair-minded people to differ in their conclusions." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). Evidence is less than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion that the fact exists." *Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex. 2010).

To prevail on her claim of direct medical negligence against Raval, Dorsey was required to establish four elements: (1) a duty by the physician to act according to a certain standard of care, (2) a breach of the applicable standard of care, (3) injury or harm to the plaintiff, and (4) a causal connection between the breach of the applicable standard of care and the injury or harm. *See, e.g., Brandt*, 194 S.W.3d at 115.

It is undisputed that Lovelace was an employee of Christus, not Raval. However, under the "borrowed servant" doctrine, the "employee of one employer may become the borrowed employee of another with respect to some activities." *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 537 (Tex. 2002). "[I]t is the shift of the right to direct and control the details of the work that transforms a general employee of one employer into a borrowed employee of another, rendering the new employer vicariously liable for the borrowed employee's actions." *Id.* at 542. Therefore, to prevail on her claim of vicarious liability against Raval, Dorsey was required to show that (1) Lovelace was directly liable for the child's injuries and (2) Raval had "the right to direct and control the details" of Lovelace's work. *See id.*

### ii. Evidence

In response to Raval's motions, Dorsey produced several pieces of evidence, including the affidavit by neonatologist Chaudhry. In the affidavit, Chaudhry stated that she "has knowledge of the accepted standards of care for health care providers for the

11

diagnosis, care and treatment of the injury and condition involved" in Dorsey's claim.

Chaudhry further stated, in part, as follows:

6. [Christus], and the doctors and nurses that were responsible for taking care or [sic] [Ezra], failed to use ordinary care in providing treatment for [Ezra] that reasonable and prudent hospitals, doctors and nurses of the same or similar level of certification would have employed under the same or similar circumstances.

7. Specifically, [Christus], and the doctors and nurses that were responsible for taking care of [Ezra]: failed to use devices and techniques to prevent [Ezra] from falling on the floor and suffering a skull fracture at Christus; failed to keep watch over [Ezra] while she was undergoing treatment to prevent her from falling on the floor at Christus; failed to properly secure [Ezra] against falling during her treatment in [NICU] at Christus; failed to care and treat by [Ezra] [sic] in a manner that would have prevented her from falling and suffering a skull fracture at Christus; and failed to provide safe facilities in NICU at Christus for the care and treatment of [Ezra] that would have prevented [Ezra] from falling on the floor at Christus and suffering a skull fracture.

8. More specifically, according to the consultation report of Dr. Aaron Mohanty, M.D., UTMB Health, dated February 17, 2011, and the consultation report of Dr. Timothy George, Dell Children's Medical Center of Central Texas, dated October 10, 2011, [Ezra] was dropped from the arms of a RN at Christus and suffered a skull fracture. Instead of carrying [Ezra] in her arms, RN [Lovelace] should have taken care of [Ezra] in her crib. Additionally, all cords and other obstacles should have been removed from the area to avoid any cords or other obstacles from becoming entangled with [Lovelace]'s legs or the legs of the crib to prevent [Lovelace] from dropping [Ezra] from her arms. However, instead of taking care of [Ezra] in her crib, [Lovelace] decided to care for [Ezra] in her arms. In my opinion, [Ezra] would not have fallen from [Lovelace]'s arms and suffered a skull fracture if [Lovelace] had taken care of [Ezra] in her crib. This opinion is based upon the facts in above referenced medical records.

9. Additionally, according to the progress medical records provided Christus, dated September 13, 2010, [Ezra] fell from her crib while [Lovelace] was taking care of her when a cord had tangled with [Lovelace]'s leg and [Ezra] fell off the crib. All cords and other obstacles should have been removed from the area to avoid any cords or other obstacles from becoming entangled with [Lovelace]'s legs or the legs of the crib to prevent [Lovelace] from knocking over

12

the crib and to prevent [Ezra] from falling off the crib while [Lovelace] was taking care of her.

10. In addition, Christus and Dr. Raval, as the Medical Director of Christus' Neonatal Intensive Care Unit were responsible for providing care and services to [Ezra], and should have developed policies and procedure [sic] to prevent [Ezra] from falling on the floor or being dropped from the arms of [Lovelace] and suffering a skull fracture and/or to prevent [Ezra] from falling from her crib while being cared for by [Lovelace] and suffering a skull fracture. In my opinion, [Ezra] would not have been dropped from the arms of [Lovelace] and suffered a skull fracture and [Ezra] would not have fallen from her crib and suffered a skull fracture if Christus and Dr. Raval have [sic] developed and implemented policies, procedures and training for [Lovelace] and their staff in safe caring of babies like [Ezra] . . . . This opinion is based upon the facts in above referenced medical records.

Dorsey also provided an unsworn report by Jerry J. Tomasovic, M.D., a child neurologist, who stated in part that "[i]t is clear that dropping an infant to the floor high enough to sustain a skull fracture places the infant at risk for subsequent neurologic sequelae. This also would represent a breach of safety outside of the standard of care expected for an infant in a neonatal nursery."

Finally, Dorsey provided a copy of Raval's deposition testimony, which included the following exchanges:

Q. [Dorsey's counsel]   All right. So, Nurse Lovelace was following the orders that you wrote for Baby Ezra's care when she was taking care of her.

A. [Raval]   Yes.

Q.   All right. Now, as part of the orders that you write for the nurses is it—does it include like safety protocol and that sort of thing, too?

A.   No. That is followed—they're supposed—that—that's followed by—according to the nursing policy and procedure by the nurses. I don't write orders for those things.

13

Q.                  Do you write orders for—like, for example, what you wanted Nurse Lovelace to do in terms of the medications that the baby got, what kind of treatment she received, and that sort of thing?

A.                  Yes, medical aspect of the—

Q.                  Okay.

A.                  —care.

Q.                  You wrote the orders that she was following returning—concerning the medical care that the baby was getting.

A.                  That's correct.

. . . .

Q.                  All right. Now, do you believe that the care and custody of Baby Ezra, when she was in your NIC unit, was ultimately your responsibility?

[Raval's counsel]:    Objection, form.

A.                  She was under my care during the stay in the neonatal ICU.

Q.                  Right.

A.                  Under my medical care. That's correct. I am her doctor—

Q.                  Right.

A.                  —during that time period.

Q.                  And do you believe that as her doctor and the director of the medical unit that you were primarily responsible for the care and treatment that she got while she was in that unit?

[Raval's counsel]:    Objection, form.

A.                  Well, there are many people involved in the care of an infant. As a physician, I'm responsible for her care, yes.

Q.                  Okay. Ultimately responsible—

14

| [Raval's counsel]: | Objection, form. |
|---|---|
| Q. | —as her physician.  Correct? |
| [Raval's counsel]: | Objection, form. |
| A. | I'm not sure how to answer that question.  I'm responsible as a physician.  That's what I'm saying. |
| Q. | You were responsible as—as the physician for the care of Baby Ezra in this case.  Correct? |
| A. | As a— |
| [Raval's counsel]: | Objection, form. |
| A. | —as a physician. |

### iii.    Analysis

First, as to Dorsey's claim of direct liability against Raval, we do not find a scintilla of evidence establishing that Raval breached any applicable standard of care.  Chaudhry stated that Raval "should have developed policies and procedure [sic] to prevent [Ezra] from falling on the floor or being dropped from the arms of [Lovelace] and suffering a skull fracture and/or to prevent [Ezra] from falling from her crib while being cared for by [Lovelace] and suffering a skull fracture."  However, Chaudhry did not opine as to what policies and procedures, in particular, would have satisfied Raval's duty.  *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (noting that "the expert must explain the basis of his statements to link his conclusions to the facts"); *Palacios*, 46 S.W.3d at 880 ("Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently.").  Moreover, neither Chaudhry's affidavit nor any of Dorsey's other summary judgment evidence actually established that Raval *failed* to establish safety policies and

15

procedures. We find that the trial court did not err in granting summary judgment to Raval on Dorsey's claims of direct liability.

We next address the vicarious liability claims. The evidence clearly showed that Lovelace became entangled in wires attached to the child's monitoring equipment and dropped the child as a result. Chaudhry's affidavit and Tomasevic's report may or may not have established, with the requisite specificity, that Lovelace breached a standard of care in failing to ensure that the floor was clear of wires. Nevertheless, even assuming that the evidence supports a finding that Lovelace was individually liable, there is no evidence establishing that Raval had "the right to direct and control the details" of Lovelace's work with respect to her allegedly negligent behavior. *See St. Joseph Hosp.*, 94 S.W.3d at 542; *Elizondo v. Tavarez*, 596 S.W.2d 667, 671 (Tex. Civ. App.—Corpus Christi 1980, writ ref'd n.r.e.) ("Under the borrowed servant doctrine in a suit for malpractice against a doctor, the controlling question is whether the doctor had the right to control the 'servant' in the details of the specific act or omission raising the issue of liability."). Raval conceded that Lovelace was following his orders with respect to the "medical aspect" of Ezra's treatment, but he explicitly denied that he "write[s] orders" for "safety protocol and that sort of thing." There was no other evidence adduced establishing that Raval had the right to direct or control the details of Lovelace's work as it pertained to safety procedures. Therefore, we conclude that the trial court did not err in granting summary judgment to Raval on Dorsey's claims of vicarious liability under the "borrowed servant" doctrine.

Dorsey's fourth issue is overruled.

## C.     Award of Attorney's Fees and Costs

Finally, by her thirteenth issue on appeal, Dorsey contends that the award of costs in the final judgment was error "because Dr. Raval has not plead and he has not presented any evidence to the Court that shows that he is entitled to any attorney's fees, costs or any other expenses in this case under any rule or statute." *See, e.g., Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 95 (Tex. 1999) ("[A] prevailing party cannot recover attorney's fees from an opposing party unless permitted by statute or by contract between the parties.").

The final judgment rendered in this case, dated May 20, 2014, provides that "[c]osts and expenses associated with the creation of the new case file" as a result of the severance order and "[a]ll costs of court incurred in this suit" are to be borne by Dorsey. The judgment does not award attorney's fees. The award of costs was authorized by Texas Rule of Civil Procedure 131. *See* TEX. R. CIV. P. 131 ("The successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided."). We overrule Dorsey's thirteenth issue.

## III. CONCLUSION

The trial court's judgment is affirmed.


                                                    DORI CONTRERAS GARZA,
                                                    Justice

Delivered and filed the
31st day of August, 2015.

17